SEA–LAND SERVICES, INC.,
Plaintiff–Appellee,

v.

The PEPPER SOURCE, Caribe Crown, Inc., Gerald Marchese doing business as Jamar Corporation, et al., Defendants–Appellants.

No. 90–2589.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1991.

Decided Aug. 20, 1991.

Duane C. Weaver, Ray, Robinson, Hanninen & Carle, Chicago, Ill., David G. Davies, Sandra M. Kelly, argued, Ray, Robinson, Hanninen & Carle, Cleveland, Ohio, for plaintiff-appellee.

Frank J. DeSalvo, argued, Aldo E. Botti, Howard R. Wertz, Botti, Marinaccio, DeSalvo & Tameling, Oak Brook, Ill., for defendants-appellants.

Before BAUER, Chief Judge, WOOD, JR., and POSNER, Circuit Judges.

BAUER, Chief Judge.

This spicy case finds its origin in several shipments of Jamaican sweet peppers. Appellee Sea–Land Services, Inc. ("Sea–Land"), an ocean carrier, shipped the peppers on behalf of The Pepper Source ("PS"), one of the appellants here. PS then stiffed Sea–Land on the freight bill, which was rather substantial. Sea–Land filed a federal diversity action for the mon-

ey it was owed. On December 2, 1987, the district court entered a default judgment in favor of Sea–Land and against PS in the amount of $86,767.70. But PS was nowhere to be found; it had been "dissolved" in mid–1987 for failure to pay the annual state franchise tax. Worse yet for Sea–Land, even had it not been dissolved, PS apparently had no assets. With the well empty, Sea–Land could not recover its judgment against PS. Hence the instant lawsuit.

In June 1988, Sea–Land brought this action against Gerald J. Marchese and five business entities he owns: PS, Caribe Crown, Inc., Jamar Corp., Salescaster Distributors, Inc., and Marchese Fegan Associates.[1] Marchese also was named individually. Sea–Land sought by this suit to pierce PS's corporate veil and render Marchese personally liable for the judgment owed to Sea–Land, and then "reverse pierce" Marchese's other corporations so that they, too, would be on the hook for the $87,000. Thus, Sea–Land alleged in its complaint that all of these corporations "are alter egos of each other and hide behind the veils of alleged separate corporate existence for the purpose of defrauding plaintiff and other creditors." Count I, ¶ 11. Not only are the corporations alter egos of each other, alleged Sea–Land, but also they are alter egos of Marchese, who should be held individually liable for the judgment because he created and manipulated these corporations and their assets for his own personal uses. Count III, ¶¶ 9–10. (Hot on the heels of the filing of Sea–Land's complaint, PS took the necessary steps to be reinstated as a corporation in Illinois.)

In early 1989, Sea–Land filed an amended complaint adding Tie–Net International, Inc., as a defendant. Unlike the other corporate defendants, Tie–Net is not owned solely by Marchese: he holds half of the stock, and an individual named George An-

dre owns the other half. Sea–Land alleged that, despite this shared ownership, Tie–Net is but another alter ego of Marchese and the other corporate defendants, and thus it also should be held liable for the judgment against PS.

Through 1989, Sea–Land pursued discovery in this case, including taking a two-day deposition from Marchese. In December 1989, Sea–Land moved for summary judgment. In that motion—which, with the brief in support and the appendices, was about three inches thick—Sea–Land argued that it was "entitled to judgment as a matter of law, since the evidence including deposition testimony and exhibits in the appendix will show that piercing the corporate veil and finding the status of an alter ego is merited in this case." Marchese and the other defendants filed brief responses.

■ In an order dated June 22, 1990, the court granted Sea–Land's motion. The court discussed and applied the test for corporate veil-piercing explicated in *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565 (7th Cir.1985). Analyzing Illinois law, we held in *Van Dorn* that

a corporate entity will be disregarded and the veil of limited liability pierced when two requirements are met:

[F]irst, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

753 F.2d at 569–70 (quoting *Macaluso v. Jenkins*, 95 Ill.App.3d 461, 50 Ill.Dec. 934, 938, 420 N.E.2d 251, 255 (1981)) (other citations omitted). *See also Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 205, 56 Ill.Dec. 14, 21, 427 N.E.2d 94, 101 (1981) (Illinois Supreme Court stating the test in

---

1. This last defendant is a partnership. Because Sea–Land served only one partner—Marchese—the district court did not consider or enter judgment on Sea–Land's claims against this entity. *See Sea–Land Services, Inc. v. The Pepper Source,* No. 88 C 4861, slip op. at 2 n. 2, 1990

WL 91497, 1990 U.S. Dist. LEXIS 7676 (N.D.Ill. June 22, 1990) ("Dist.Ct.Op."). Thus, for all practical purposes, the entity of Marchese Fegan Associates is out of this case, and henceforth our references to "the defendants" do not include this entity.

essentially the same terms); *Pederson v. Paragon Pool Enterprises*, 214 Ill.App.3d 815, 158 Ill.Dec. 371, 373, 574 N.E.2d 165, 167 (1st Dist.1991) (recent veil-piercing case applying essentially the same test). As for determining whether a corporation is so controlled by another to justify disregarding their separate identities, the Illinois cases, as we summarized them in *Van Dorn*, focus on four factors: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." 753 F.2d at 570 (citations omitted). *See also Main Bank*, 427 N.E.2d at 102; *Pederson*, 214 Ill.App.3d at 820, 158 Ill.Dec. at 374, 574 N.E.2d at 168.

Following the lead of the parties, the district court in the instant case laid the template of *Van Dorn* over the facts of this case. Dist.Ct.Op. at 3–12. The court concluded that both halves and all features of the test had been satisfied, and, therefore, entered judgment in favor of Sea–Land and against PS, Caribe Crown, Jamar, Salescaster, Tie–Net, and Marchese individually. These defendants were held jointly liable for Sea–Land's $87,000 judgment, as well as for post-judgment interest under Illinois law. From that judgment Marchese and the other defendants brought a timely appeal.

Because this is an appeal from a grant of summary judgment, our review is *de novo*. Thus, our task is to examine the evidence for ourselves, apply the same standard as the district court (namely, the *Van Dorn* test), and determine whether there is no genuine issue of material fact and whether Sea–Land is entitled to judgment as a matter of law. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 234 (7th Cir.1991) (citing, *inter alia*, Fed.R.Civ.P. 56(c)).

■ The first and most striking feature that emerges from our examination of the record is that these corporate defendants are, indeed, little but Marchese's playthings. Marchese is the sole shareholder of PS, Caribe Crown, Jamar, and Salescast-

er. He is one of the two shareholders of Tie–Net. Except for Tie–Net, none of the corporations ever held a single corporate meeting. (At the handful of Tie–Net meetings held by Marchese and Andre, no minutes were taken.) During his deposition, Marchese did not remember any of these corporations ever passing articles of incorporation, bylaws, or other agreements. As for physical facilities, Marchese runs all of these corporations (including Tie–Net) out of the same, single office, with the same phone line, the same expense accounts, and the like. And how he does "run" the expense accounts! When he fancies to, Marchese "borrows" substantial sums of money from these corporations—interest free, of course. The corporations also "borrow" money from each other when need be, which left at least PS completely out of capital when the Sea–Land bills came due. What's more, Marchese has used the bank accounts of these corporations to pay all kinds of personal expenses, including alimony and child support payments to his ex-wife, education expenses for his children, maintenance of his personal automobiles, health care for his pet—the list goes on and on. Marchese did not even have a personal bank account! (With "corporate" accounts like these, who needs one?)

And Tie–Net is just as much a part of this as the other corporations. On appeal, Marchese makes much of the fact that he shares ownership of Tie–Net, and that Sea–Land has not been able to find an example of funds flowing from PS to Tie–Net to the detriment of Sea–Land and PS's other creditors. So what? The record reveals that, in all material senses, Marchese treated Tie–Net like his other corporations: he "borrowed" over $30,000 from Tie–Net; money and "loans" flowed freely between Tie–Net and the other corporations; and Marchese charged up various personal expenses (including $460 for a picture of himself with President Bush) on Tie–Net's credit card. Marchese was not deterred by the fact that he did not hold all of the stock

of Tie–Net; why should his creditors be?[2]

In sum, we agree with the district court that their can be no doubt that the "shared control/unity of interest and ownership" part of the *Van Dorn* test is met in this case: corporate records and formalities have not been maintained; funds and assets have been commingled with abandon; PS, the offending corporation, and perhaps others have been undercapitalized; and corporate assets have been moved and tapped and "borrowed" without regard to their source. Indeed, Marchese basically punted this part of the inquiry before the district court by coming forward with little or no evidence in response to Sea–Land's extensively supported argument on these points. That fact alone was enough to do him in; opponents to summary judgment motions cannot simply rest on their laurels, but must come forward with specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) ("[O]pponent [to summary judgment motion] must do more than simply show that there is some metaphysical doubt as to the material facts."); Fed.R.Civ.P. 56(e). Regarding the elements that make up the first half of the *Van Dorn* test, Marchese and the other defendants have not done so. Thus, Sea–Land is entitled to judgment on these points.

■ The second part of the *Van Dorn* test is more problematic, however. "Unity of interest and ownership" is not enough; Sea–Land also must show that honoring the separate corporate existences of the defendants "would sanction a fraud or pro-

mote injustice." *Van Dorn*, 753 F.2d at 570. This last phrase truly is disjunctive:

Although an intent to defraud creditors would surely play a part if established, the Illinois test does not require proof of such intent. Once the first element of the test is established, *either* the sanctioning of a fraud (intentional wrongdoing) or the promotion of injustice, will satisfy the second element.

*Id.* (emphasis in original). Seizing on this, Sea–Land has abandoned the language in its two complaints that make repeated references to "fraud" by Marchese, and has chosen not to attempt to *prove* that PS and Marchese intended to defraud it—which would be quite difficult on summary judgment.[3] Instead, Sea–Land has argued that honoring the defendants' separate identities would "promote injustice."

But what, exactly, does "promote injustice" mean, and how does one establish it on summary judgment? These are the critical, troublesome questions in this case. To start with, as the above passage from *Van Dorn* makes clear, "promote injustice" means something less than an affirmative showing of fraud—but how much less? In its one-sentence treatment of this point, the district court held that it was enough that "Sea–Land would be denied a judicially-imposed recovery." Dist.Ct.Op. at 11–12. Sea–Land defends this reasoning on appeal, arguing that "permitting the appellants to hide behind the shield of limited liability would clearly serve as an injustice against appellee" because it would "impermissibly deny appellee satisfaction." Appellee's Brief at 14–15. But that cannot be what is meant by "promote injustice." The prospect of an unsatisfied judgment looms in every veil-piercing action; why else would a plaintiff bring such an action? Thus, if an unsatisfied judgment is enough for the

---

**2.** We note that the record evidence in this case, if true, establishes that for years Marchese flagrantly has disregarded the tax code concerning the treatment of corporate funds. Yet, when we inquired at oral argument whether Marchese currently is under investigation by the IRS, his counsel informed us that to his knowledge he is not. Marchese also stated in his deposition that he never has been audited by the IRS. If these statements are true, and the IRS has so far

shown absolutely no interest in Marchese's financial shenanigans with his "corporations," how and why that has occurred may be the biggest puzzles in this litigation.

**3.** For a discussion of facts that support a finding of intent to defraud, *see Torco Oil Co. v. Innovative Thermal Corp.*, 763 F.Supp. 1445, 1451–52 (N.D.Ill.1991).

"promote injustice" feature of the test, then *every* plaintiff will pass on that score, and *Van Dorn* collapses into a one-step "unity of interest and ownership" test.

Because we cannot abide such a result, we will undertake our own review of Illinois cases to determine how the "promote injustice" feature of the veil-piercing inquiry has been interpreted. In *Pederson*, a recent case from the Illinois court of appeals, the court offered the following summary: "Some element of unfairness, something akin to fraud or deception or the existence of a compelling public interest must be present in order to disregard the corporate fiction." 214 Ill.App.3d at 821, 158 Ill.Dec. at 375, 574 N.E.2d at 169. (The court ultimately refused to pierce the corporate veil in *Pederson*, at least in part because "[n]othing in these facts provides evidence of scheming on the part of defendant to commit a fraud on potential creditors [of the two defendant corporations]." *Id.* at 823, 158 Ill.Dec. at 376, 574 N.E.2d at 170.)

The light shed on this point by other Illinois cases can be seen only if we examine the cases on their facts. *Perivoliotis v. Pierson*, 167 Ill.App.3d 259, 118 Ill.Dec. 186, 521 N.E.2d 254 (1988), was a complicated adverse possession case that addresses briefly the meaning of the "injustice" requirement. The issue in the case was whether an individual (Woulfe) could possess a strip of land adversely to a corporation (TomDon) that held title to the land, when Woulfe was the president and one of only two shareholders (the other, his wife) of TomDon. The court held that, because TomDon was merely Woulfe's alter ego, Woulfe could not possess the land "adversely." In so holding, the court stated that "the running of the prescriptive period against a corporation's property during a period when the corporation's principal owner and president mistakenly possessed the encroachment area in his individual capacity defies common sense and is the type of 'injustice' that would justify piercing the corporate veil." *Id.* 118 Ill.Dec. at 188, 521 N.E.2d at 256.

*Gromer, Wittenstrom & Meyer, P.C. v. Strom*, 140 Ill.App.3d 349, 95 Ill.Dec. 149, 489 N.E.2d 370 (1986), was another unfortunately complicated case in which our issue was addressed. Basically, three individuals, W, M, and S, were partners. All three signed a note agreeing to be jointly and severally liable for a debt owed to a bank. S left the partnership and it dissolved. W & M then formed a new corporation, W & M Co., of which they were the sole shareholders. W & M Co. paid off the bank and became the assignee of the note, and then promptly sued S for collection on the note. Putting to one side the rather abstruse procedural posture of the case, suffice it to say that W & M Co. won at the trial level and appealed. On appeal, S claimed that the court should pierce the corporate veil and recognize W & M Co. for what it really was—his former partners and cosigners on the note; the reason being that cosigners cannot payoff a note and then take judgment on the note against another cosigner. The appellate court agreed and vacated the judgment:

> We believe that these facts and arguments sufficiently indicate that to recognize [W & M Co.] as an entity separate from its shareholders would be to sanction an injustice. Where such an injustice would result and there is such unity of interest between the corporation and the individual shareholders that the separate personalities no longer exist, the corporate veil must be pierced.

*Id.* 95 Ill.Dec. at 153, 489 N.E.2d at 374 (citations omitted).

In *B. Kreisman & Co. v. First Arlington Nat'l Bank of Arlington Heights*, 91 Ill.App.3d 847, 47 Ill.Dec. 757, 415 N.E.2d 1070 (1980), the appellate court reversed the trial court's refusal to pierce the veil. Defendant corporation stiffed plaintiff for the bill on some restaurant equipment, so plaintiff sued for a mechanics lien. Plaintiff won at trial, but the trial court would not pierce the defendant corporation's veil and also hold liable the individual who was the "dominant force" controlling the defendant corporation. Noting that the equipment, though never paid for, was used by the defendant corporation for several years, the appellate court stated, "Under these circumstances we believe the corporate veil should be pierced to require [the 'dominant individual'] to be personally lia-

ble; to say otherwise would promote an injustice and permit her to be unjustly enriched at plaintiff's expense." *Id.* 47 Ill. Dec. at 760, 415 N.E.2d at 1073 (citations omitted).

Federal district courts sitting in Illinois also have on occasion discussed what kind of "injustice" suffices under the second half of the *Van Dorn* test. *In re Conticommodity Services, Inc., Securities Litigation,* 733 F.Supp. 1555 (N.D.Ill.1990), involved a complex, multidistrict litigation that ultimately had little to do with veil-piercing. At one point in its opinion, however, the district court considered whether a trial was necessary on the claim that a parent corporation should be pierced to satisfy a liability of one of its subsidiaries. The court concluded that the issue should go to trial, because "it may be an injustice" to allow the parent to avoid the sub's liabilities when the parent closed down the sub and left it with insufficient funds to satisfy its liabilities, and those liabilities were caused in part by a practice of the sub mandated by the parent. *Id.* at 1565. In *Boatmen's Nat'l Bank of St. Louis v. Smith,* 706 F.Supp. 30 (N.D.Ill.1989), the court granted a judgment creditor's request to "reverse pierce" the veil of a corporation whose sole shareholder, director, and president was liable for the judgment. The opinion contained some unfortunate language, cited by the district court in the instant case, to the effect that plaintiff's unsatisfied judgment was enough: "It is also clear that separate corporate existence would sanction a fraud or promote injustice. That plaintiff would be denied a judicially-imposed recovery seems injustice enough." *Id.* at 32. The court does not cite or examine any Illinois cases on this point, however, and, as we discuss above, sound reasoning and logic suggest that this simply cannot be enough.

Finally, *Van Dorn* itself is somewhat instructive. In that case, we affirmed the district court's decision to pierce the corporate veil of one corporation ("Future") to get at the assets held by another ("Sovereign of Illinois") for the benefit of a creditor who had shipped Future some packing cans ("Milton"). As to the second half of the test, we stated as follows:

Eventually Future was stripped of its assets and rendered insolvent to the prejudice of Milton, its only creditor, while Sovereign of Illinois received the benefits of the Milton can shipments. The record supported the trial court's finding that such a result was unjust and warranted piercing the corporate veil between Future and Sovereign of Illinois to hold Sovereign of Illinois liable for the price of the cans.

753 F.2d at 572–73. Further, it is clear from various other passages in the opinion that the district court concluded, and the evidence showed, that Roth, the individual who controlled both Future and Sovereign of Illinois, intentionally manipulated the corporations so that Future assumed the liabilities but held no assets, while other corporations received the assets but not the liabilities. *See, e.g., id.* at 569.

Generalizing from these cases, we see that the courts that properly have pierced corporate veils to avoid "promoting injustice" have found that, unless it did so, some "wrong" beyond a creditor's inability to collect would result: the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful. Sea–Land, although it alleged in its complaint the kind of intentional asset- and liability-shifting found in *Van Dorn,* has yet to come forward with evidence akin to the "wrongs" found in these cases. Apparently, it believed, as did the district court, that its unsatisfied judgment was enough. That belief was in error, and the entry of summary judgment premature. We, therefore, reverse the judgment and remand the case to the district court.

On remand, the court should require that Sea–Land produce, if it desires summary judgment, evidence and argument that would establish the kind of additional

"wrong" present in the above cases. For example, perhaps Sea–Land could establish that Marchese, like Roth in *Van Dorn,* used these corporate facades to avoid its responsibilities to creditors; or that PS, Marchese, or one of the other corporations will be "unjustly enriched" unless liability is shared by all. Of course, Sea–Land is not required fully to prove intent to defraud, which it probably could not do on summary judgment anyway. But it is required to show the kind of injustice to merit the evocation of the court's essentially equitable power to prevent "injustice." It may well be that, after more of such evidence is adduced, no genuine issue of fact exists to prevent Sea–Land from reaching Marchese's other pet corporations for PS's debt. Or it may be that only a finder of fact will be able to determine whether fraud or "injustice" is involved here. In any event, the record as it currently stands is insufficient to uphold the entry of summary judgment.

REVERSED and REMANDED with instructions.